**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DAVID GILBERG, DOUGLAS R. STOKES, and** | ) | |
| **TERESA G. LEONARD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Consolidated** |
| | ) | **Case No. 6:15-cv-03365-MDH** |
| | ) | |
| **ASSOCIATED WHOLESALE GROCERS, INC.,** | ) | |
| **TODD COOPER, and JOHN DOES 1-10,** | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

Before the Court is Defendants' Motion for Summary Judgment (Doc. 143).

## LEGAL STANDARD

Summary judgment is proper if, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Anderson*, 466 U.S. at 248-49. "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Togerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (quoting *Fercello v. Cnty. Of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)).

## BACKGROUND

This matter arises from a dispute concerning Associated Wholesale Grocers, Inc.'s (AWG), decision to terminate the employment of three individuals: Teresa Leonard, David Gilberg, and Douglas Stokes. The stated reasons for their termination relate to what AWG considered violations of its IT and Anti-Harassment Policies. Plaintiffs have brought claims for age, gender, and disability discrimination under the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, *et seq.*, on the theory that their status as members of a protected class contributed to their termination. The Court consolidated the actions brought by the three Plaintiffs for discovery and summary judgment purposes, and indicated that it would consider the merits of consolidation for a trial, if necessary. (Doc. 11).

### *The Policies*

Each of the three Plaintiffs received and acknowledged AWG's Anti-Harassment Policy and AWG's Communications and Information Systems Policy (IT Policy) at various times throughout their employment. These policies were contained in employee handbooks or supplemental policies. As supervisors, each Plaintiff was required to indicate that they acknowledged and understood their obligations regarding AWG's Anti-Harassment Policy. The

2009 version of the policy, which all three Plaintiff's acknowledged receiving, stated, in relevant part:

> Behavior prohibited by this Policy includes unwelcome conduct, whether verbal, physical, or visual, that is based upon or related to an individual's race gender, sex (whether same-sex or opposite-sex), pregnancy, color, religion, national origin, age, disability, ancestry, military or marital status or any other characteristic protected by law, and that (1) has the purpose or effect of creating an intimidating, hostile or offensive working environment (2) has the purpose or effect of unreasonably interfering with an individual's work performance or (3) otherwise adversely effects an individual's employment opportunities.

> Examples of prohibited conduct in the form of sexual harassment include, but are not limited to . . . sexual jokes, comments, suggestions or innuendo; foul or obscene language or gestures; display of foul or obscene printed or visual material. . . .

> Additional examples of prohibited conduct in the form of other illegal harassment include epithets, slurs, negative stereotyping, written or graphic material, including e-mails, that denigrate or show hostility toward an individual, or any other threatening or intimidating act that relates to race, gender, sex . . . disability. . . .

> The Company's anti-harassment policy is violated when . . . (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, abusive or offensive working environment, even if it leads to no adverse job consequences.[1]

As of May 2006, AWG's Employee handbook included an IT Policy, which stated:

> No harassing, embarrassing, indecent, profane, abusive, sexually explicit, obscene, vulgar, intimidating, defamatory or otherwise offensive language or material (including, without limit, offensive material relating to sex, race, color, national origins, religion, age, disability or any other protected characteristic) may be sent, intentionally received, downloaded, stored or otherwise accessed or displayed on or using AWG's Communication Systems. AWG's policies prohibiting discrimination, and sexual or other forms of harassment apply fully to the use of its Communication Systems. Any employees encountering or receiving such material *must* immediately report the incident to his or her supervisor, department manager, or the Human Resources Department.

---

[1] A substantially similar policy was in effect as of 2013. The record is not entirely clear as to whether all three Plaintiff's acknowledged receipt of the 2013 policy.

The policy further indicated that violation of its terms could lead to discipline up to termination of employment. Each employee acknowledged receipt of the IT Policy. In September 2010, all employees in the Springfield division of AWG received an email containing AWG's IT Policy, which further indicated that violations of the policy by employees put their jobs at risk.

*Leonard's Termination*

Plaintiff Teresa Leonard began working at AWG in 1985, and was 59 years old with 29 years of service at AWG at the time of her termination on April 4, 2014. She reported directly to Defendant Todd Cooper from January 2011 to March 2012, and worked as a second shift warehouse supervisor from early 2012 until her termination in 2014. During her employment, Plaintiff Leonard attended training regarding AWG's Anti-Discrimination and Anti-Harassment Policies, and she knew it was her duty as a supervisor to prevent discrimination or harassment. She further knew that she could take any questions she had about those policies to the HR Department.

In late March 2014, an email was discovered on a printer at AWG's office in Nashville, Tennessee. That email contained the following language:

> PUBLIC SERVICE
> ANNOUNCEMENT
> *EFFECTIVE IMMEDIATELY*
> To ALL Contractors, Plumbers, and Electricians
> The term "N***** Rigged"[2] is absolutely no longer
> acceptable.
> You will now refer to it as a "Presidential Solution."

Plaintiff Leonard received this email on her work email address from someone outside of AWG.

The printout found in Nashville identified Plaintiff Leonard's email address in the corner. Plaintiff

---

[2] The Court censors the term used in the email for the purposes of this Order. The email, as printed, did not censor the word in question and its use is not disputed. The parties do not dispute that the censored word is a racial slur referring to African American persons.

Leonard denies printing the email in Nashville, but admits to having received the email and printing it in Springfield before showing it to two co-workers. The email was presented to the Director of HR for AWG's Nashville Division, who contacted Tom Fenton, the HR Director for the Springfield Division, and also Susan Ott, AWG's Corporate VP of HR.

The discovery of this email led to an investigation headed by Jerry Burke, AWG's Corporate Security Manager. Mr. Burke has a background in law enforcement but limited experience in information technology and its security. Burke, with the assistance of AWG's IT Department, traced the email to a "Toughbook" laptop computer used by Plaintiff Leonard at the time the email was sent to the Nashville printer. That investigation further determined that the printing of the email in Springfield and Nashville was separated by two seconds.[3] Burke then gained access to Plaintiff Leonard's email account and further investigated the contents of her account. He found the above-cited email in her account.

On April 4, 2014, Tom Fenton (HR Director for Springfield) and Anita King (an HR employee in Springfield) met with Plaintiff Leonard to discuss the email. At that time, Plaintiff Leonard denied printing the email in Nashville but admitted that she printed it in Springfield and showed it to two other fellow supervisors. The Court notes that Plaintiff Leonard has testified in her deposition that she does not believe AWG made up the fact that the email was sent from her computer to the Nashville printer during a time when she was signed on to the Toughbook. Mr. Fenton told Plaintiff Leonard that her employment was being terminated for printing and sharing the email because these actions constituted "egregious" and "fatal" violations of AWG's policies.

---

[3] The Court notes that Plaintiff Leonard disputes these facts insofar as she argues that Burke's methodology was flawed and the results of his investigation are unreliable.

At the conclusion of the meeting, Plaintiff Leonard then told Burke that other AWG employees were sending emails that might violate AWG's policy and should be investigated.

Plaintiff Leonard has contended that she was treated differently than younger male employees who were not terminated for violations of the Anti-Harassment and IT Policies. However, Plaintiff Leonard is not aware of any other employees who have used the word "n*****" in a work environment or who showed co-workers emails or other documents using the word.

Plaintiff Leonard has claimed discrimination based on both age and gender because she believes those statuses contributed to her termination. She believes that her age contributed to it based on a few different factors. Another supervisor, Scott Kamysz (age 35), sent an email using another employee's email account, without the knowledge or the permission of that employee, containing sexual references to Defendant Todd Cooper. Kamysz's punishment was both delayed and limited to a letter of reprimand. Plaintiff Leonard was neither counseled nor given an opportunity to correct her behavior. Instead, she was immediately fired. Furthermore, Plaintiff Leonard had a very high salary due to her length of time with AWG and her prior positions at AWG — her salary was 147% of the midrange salary for a warehouse supervisor. This unusually high salary for her position was based on her previous position in which such a salary would be normal, but that position was eliminated. She was moved to the warehouse supervisor position but was allowed to keep her salary. AWG admits Defendant Todd Cooper made comments regarding Plaintiff Leonard's salary, for example, that she was paid more than Cooper; that she was paid more than other warehouse supervisors; and that Cooper believed her salary was inappropriate.

Plaintiff Leonard asserts she was passed over for two promotions in favor of younger women, even though she believes she was the best qualified person. Plaintiff Leonard also points to her participation and vested status in a pension plan that AWG no longer made available to more

recent hired employees as a factor in her termination and as evidence of age discrimination. AWG stopped enrolling individuals in its old pension plan starting in 2012, but grandfathered in employees who were already eligible to participate in it.[4] However, considering all of these assertions, Plaintiff Leonard has never heard a manager or director make any age-related comments during her employment.

Plaintiff Leonard has also asserted a claim for gender discrimination. Plaintiff Leonard believes that Defendant Cooper treated her differently because of her high salary and her gender. Plaintiff Leonard has alleged that Cooper said it was "bullshit" that she kept her salary after her transfer to the warehouse. Plaintiff Leonard points to a comment made by Defendant Cooper as possibly being gender-motivated: Defendant Cooper once asked her what she was going to do in the warehouse, which Plaintiff Leonard took as a statement challenging her ability to perform warehouse duties. This comment was made nine years prior to her termination. Plaintiff Leonard has also asserted that she received less desirable shifts and work assignments, including having to clean up things when she was a sanitation supervisor. However, Plaintiff Leonard has no knowledge of whether men were asked to work similar shifts or perform similar tasks. At no time did Plaintiff Leonard file a claim of age or gender discrimination with AWG until after her termination.

---

[4] The Court notes that the contents of the pension plan have not been presented to the Court in the Statement of Uncontroverted Facts for Defendants' Motion for Summary Judgment. Although Plaintiff Leonard was questioned regarding her understanding of the plan, the plan itself is not in evidence.

*Gilberg's Termination*

Plaintiff David Gilberg began working for AWG in March 1982. During his employment, Plaintiff Gilberg attended training regarding AWG's Anti-Discrimination and Anti-Harassment Policies, and he knew it was his duty as a supervisor to prevent discrimination or harassment. He further knew that he could take any questions he had about those policies to the HR Department.

In early 2010, Plaintiff Gilberg received an email from Jerry Rhodes, who was then also employed by AWG, containing twenty-six nude photos of women.[5] In April 2010, Plaintiff Gilberg forwarded that email to three AWG employees Brian Reynolds, Ben Walker, and John Hale, at their AWG email addresses.[6] That email was titled "SYBSTD Second Edition. It's Send Your Buddy Some Titties Day." This email was discovered as part of Burke's investigation following the termination of Plaintiff Leonard's employment. Plaintiff Gilberg's employment with AWG was terminated on April 28, 2014, at the age of 57 after 32 years of service.

Plaintiff Gilberg has made a claim for age discrimination alleging his age contributed to the decision to terminate him, particularly in light of the fact that the email in question was four years old at the time it was discovered. Plaintiff Gilberg claims the denial of an opportunity to correct his behavior also reflects some discriminatory intent. He joins Plaintiff Leonard in pointing out that Scott Kamysz, a younger AWG supervisor, accessed a different employee's email account and used it to send a sexually suggestive email but only received a letter of reprimand as discipline. Plaintiff Gilberg also thinks that age played a role in his termination due to his salary, vested

---

[5] By the time the emails were discovered in 2014, Jerry Rhodes had already retired from AWG.
[6] Neither Reynolds nor Walker were employed at AWG by the time the email was discovered. When AWG investigated John Hale's account, the email was not present. As such, AWG did not discipline Hale because he likely deleted the email as was expected under AWG's policies.

position in the old pension plan, and what he called his "disposability" compared to other supervisors with other skills. Plaintiff Gilberg, like Plaintiff Leonard, never heard Defendant Todd Cooper or any other management person at AWG make age-related comments.

*Stokes's Termination*

Plaintiff Douglas Stokes began working at AWG in 1984. During his employment, Plaintiff Stokes attended training regarding AWG's Anti-Discrimination and Anti-Harassment Policies, and he knew it was his duty as a supervisor to prevent discrimination or harassment. He further knew that he could take any questions he had about those policies to the HR Department.

A handful of emails are at issue regarding Plaintiff Stokes's termination. Plaintiff Stokes received the following three emails:[7] One was titled "If men wrote advice columns," received on September 21, 2012, which purported to give advice to women regarding their husbands and made numerous references to oral sex and cooking meals for their husbands. The second was titled "Blow Dryer Mishap," received on January 16, 2013, and it referenced oral sex. And the third was titled "It's Frank," received on February 3, 2012 which makes an innuendo about pubic hair. Regarding the "Frank" email, Plaintiff Stokes admits to sending it to someone outside of AWG using his AWG email account. There is some degree of dispute at to whether Plaintiff Stokes ever actually received the other two emails.[8]

Further, Plaintiff Stokes sent numerous emails to Vicki Gibson, a non-supervisory employee of AWG's front office from October 2010 to March 2014.[9] These emails included

---

[7] All three emails indicate that the sender was Plaintiff Gilberg. However, AWG did not find the emails in Plaintiff Gilberg's email account during its investigation and AWG has made no claim that Plaintiff Gilberg's firing was a result of these three emails.

[8] It is not clear whether this dispute is genuine. For the moment, the Court will assume that Plaintiff Stokes did receive the emails.

[9] Plaintiff Stokes did not have any supervisory role regarding Ms. Gibson.

references to the fact that Stokes was in bed while Gibson was at work, comments on Gibson's weight, statements that Plaintiff Stokes was trying to keep his mind out of the gutter, that Plaintiff Stokes was watching Gibson on video, that he could help her home if she needed a ride, and comments on Gibson's hair and appearance. Another email sent from Plaintiff Stokes's email account[10] refers to Gibson as his "little snowflake."

Plaintiff Stokes also sent an email on September 3, 2013, to Michelle Cooper, a clerical employee for AWG, which contained the statement "thank you baby," in response to Ms. Cooper's email which stated "puttin' it in the tube :)." Plaintiff Stokes was terminated on April 28, 2014, at the age of 56 after 30 years of service. The emails in question were discovered as a part of Burke's investigation following the termination of Plaintiff Leonard's employment.

Plaintiff Stokes alleges age and disability discrimination and retaliation for seeking accommodations for a disability. Plaintiff Stokes argues that age played a role in his termination because of his salary and pension. Furthermore, Plaintiff Stokes points to the different treatment of Scott Kamysz, the timing of Plaintiff Stokes's discipline compared to his emails, and the nature of the investigation performed by AWG. Plaintiff Stokes testified that Defendant Todd Cooper once commented that day shift supervisors were expensive, which he believed was a reference to his age.

Plaintiff Stokes believes disability, or AWG's belief that he had a disability, played a role in his termination based on his work history. In 2003 and 2004, Plaintiff Stokes fainted while at work.[11] Following the 2003 fainting event, an ambulance was called for Plaintiff Stokes, he

---

[10] Plaintiff Stokes asserts that there is no evidence that he sent this email because he does not recall sending it and other people had access to his email account.

[11] During these years, Plaintiff Stokes worked for a company called Elite Logistics, which took over some of AWG's operations and took on some of AWG's employees.

flatlined, and was then in intensive care for 2-3 days. He returned to work within a week without any noted restrictions from his doctors. Additionally, no restrictions were imposed after the 2004 fainting event. In the following years, Plaintiff Stokes worked as a basketball official, purchased a farm and worked it with the assistance of family, and played golf as a stress reliever. Following Plaintiff Stokes's fainting events, his supervisor allowed him to raise his feet or lay on a cot to rest. In December 2004, Plaintiff Stokes went to the Mayo Clinic to attempt to obtain a diagnosis regarding his fainting, but not determination could be made as to the cause. In 2013, Plaintiff Stokes spoke with his supervisors regarding stress reduction and possibly getting some help performing his duties. This led AWG to assign to employees to assist Plaintiff Stokes with some tasks. Plaintiff Stokes testified in his deposition that he never talked to his managers about precisely the type of help he felt he needed due to a fear that he would lose his job and he felt AWG should figure out what help he needed. The Court notes that Kyle Klein, a Director for AWG, and Defendant Todd Cooper, Plaintiff Stokes's direct supervisor, testified that they had knowledge of Plaintiff Stokes's health problems.

Plaintiff Stokes worked with multiple doctors over the years, but none of them could diagnose the cause of his fainting or other events that led to his needing to rest. There is no indication that Plaintiff Stokes was ever given any work restrictions by his doctors.

*Termination Decision*

At AWG, termination decisions were made at the local level rather than by Susan Ott, who was the Vice President of Human Resources at the time of the firings. There is some notable dispute concerning the decision makers and the process.

Tim Bellanti, the Senior Vice President and Division Manager for Springfield, testified that a group of individuals, which included representatives from the HR and legal departments of

AWG, provided a recommendation to him to fire each of the Plaintiffs. A different panel of individuals met concerning each Plaintiff.

Tom Fenton testified that the decision to terminate Plaintiff Leonard's employment was unanimous between Fenton, Bellanti, and Ott. He further testified that the decision to terminate Plaintiffs Gilberg's and Stokes's employment was the unanimous decision of Fenton, Bellanti, Ott, and Anita Chamblee.

Susan Ott testified that Bellanti made the decision to fire the Plaintiffs and that she did not terminate anyone unless they worked for her.

Anita Chamblee testified that Fenton made the decision to terminate Plaintiff Leonard's employment and that a collaborative decision was made concerning Plaintiffs Gilberg and Stokes by Chamblee, Fenton, Bellanti, Ott, and in-house counsel Holland.

Jerry Burke testified that Fenton made the decision to terminate Plaintiff's Leonard's employment, as he fired Plaintiff Leonard immediately after the interview concluded.

There is no evidence that Defendant Cooper played any role in the decision to fire Plaintiffs.

Following the termination of Plaintiffs' employment, various individuals filled in as warehouse supervisors and to perform Plaintiffs' duties. No specific persons were hired to replace Plaintiffs. Their ages included 25, 34, 38, 39, 50, and 56 years old.

*Scott Kamysz Email*

On February 12, 2014, Scott Kamysz, a 35-year-old AWG warehouse coordinator, accessed the email account of a co-worker named Darrell Plemmons. While accessing Plemmons's email account, Kamysz sent the following email to his supervisor, Defendant Todd Cooper:

Dear tall red headed beauty,

Of all the bosses that I could have had your [*sic*] the only one that I would want to be in my live, the sheer size of your manhood makes me quiver when you walk by. Thank you for everything you have taught me in this wonderful warehouse and just watching you I learn so much, again I just want you to know that I love coming to work now that you will be by my side everyday.

Your precious Darrell

Defendant Cooper did not report this email as a violation of the Anti-Harassment or IT Policies. Cooper indicated that he did not believe the email warranted reporting to AWG's HR Department, but he did speak with Kamysz the following day to tell him that the email was inappropriate and should not have been sent. Plaintiff Leonard testified in her deposition that she believed that Defendant Cooper found the email funny.

Tom Fenton, Director of HR for Springfield, became aware of the email and met with Kamysz on April 28, 2014. Kamysz indicated that such emails happened several times in the past and were intended as a joke. He further stated that he and another supervisor were "just having a little fun" with Darrell Plemmons, but that the email was entirely his idea. Fenton directed Kamysz to return to work "with a focus on professionalism in the performance of his duties and interactions with his co-workers." As discipline, Fenton placed a formal disciplinary warning letter in Kamysz's employee file. The Court notes that the letter states Kamysz's activity was "inappropriate in that you sent mail from [Plemmons's] account without [his] knowledge or consent. The intent of this activity appears to originate from a humor perspective, but will not be tolerated in the workplace." Kamysz received no other discipline.

*The Investigation*

Following the termination of Plaintiff Leonard's employment, AWG began investigating employees' email accounts. There is some discrepancy concerning the manner in which the investigation was conducted.

Susan Ott testified that she and Jerry Burke determined that Plaintiff Leonard's email account should be examined, which led to a determination that other inappropriate emails had been sent out. Together, Ott and Burke compiled a list of individuals whose emails should be further examined. After examining some of the emails, Ott believed that the search should be performed by experts who could get the information needed, and she worked with Burke to compile a list of keywords that could be searched. An AWG IT employee then performed keyword searches.

Jerry Burke testified that he printed off select emails to provide to Susan Ott, who then gave him a list of names. Burke then went through those employees' email inboxes and printed off any non-business-related emails he found. He was later provided more names whose email accounts he searched. Burke did not indicate who made the decisions concerning whose email accounts would be searched. Further, Burke testified that he searched email accounts by examining each individual email, rather than performing keyword searches. After the termination of Plaintiff Gilberg and Stokes' employment, five more names were given to him to investigate, but he only looked at one of those five accounts and never printed any of their emails.

Tom Fenton testified that Burke provided him and Anita Chamblee with copies of emails, from which they assisted in compiling a list of active AWG employees.

In-house counsel James Holland testified that he asked AWG's IT department to perform keyword searches of email accounts belonging to employees identified during the investigation

after Plaintiffs Gilberg and Stokes were fired. He also stated that he ran some of the searches himself.

Kyle Klein, a Director for AWG, testified that AWG's IT personnel assisted AWG employees in deleting their emails both during and after the investigation. However, AWG claims that these deleted emails would have been archived.

The ages of the employees whose email accounts were examined ranged from 34 to 65 years old. It appears that thirteen employee accounts were specifically searched by Burke, and nine of them belonged to employees over the age of 40.

*Employees*

In April 2014, AWG employed fourteen warehouse supervisors and five warehouse managers, all of whom participated in AWG's old pension plan. Of the fourteen supervisors, six were over the age of 50 (this figure includes the three Plaintiffs), and one other supervisor was over the age of 40. Of the five managers, three were over the age of 50 and one other was over the age of 40. Of those nine persons over the age of 50, five remain employed with AWG today. Two retired between April 2014 and today. Of those supervisors and managers under the age of 40, all remain employed except two who were involuntarily discharged (prior to the age of 40), and one who voluntarily resigned at age 41.

Plaintiffs, and seven other warehouse supervisors and managers, comprised the top 50% of the highest salaries in the Springfield division. Plaintiffs held the three longest tenures at AWG prior to their termination.[12] From 2010 through 2015, 53 employees who worked under the same

---

[12] However, the Court notes that Plaintiffs Gilberg and Stokes had their employment briefly interrupted when they worked for Elite Logistics, which took over some duties AWG employees previously performed.

pension plan as Plaintiffs have been discharged. Of those 53, 35 were released from work due to reductions in workforce, and the remaining fifteen (not including Plaintiffs) were discharged for performance issues or policy violations. Out of the 35 employees released from work due to reductions, twelve were between 40-50 years old, eleven were between 50-60 years old, and seven were over the age of 60. Regarding the fifteen employees fired for performance or policy reasons, ten were under the age of 40. To date, AWG has 87 employees under the old pension plan: eleven under the age of 40, 24 between the ages of 40-50, 46 between the ages of 50-60, and six over the age of 60. As of the filing of this motion, all 87 are fully vested in their pensions. At the time of their firing, Plaintiffs' pensions were fully vested.

### Chad Hildebrand

Chad Hildebrand was a security officer in AWG's Springfield division. In 2013, Burke became aware that a security officer was accessing pornographic sites through AWG's system. That person was Chad Hildebrand. Mr. Hildebrand, who was under the age of 40, was fired for violations of AWG's policies. Again, there is some dispute over who made the termination decision. Fenton testified that he made the decision, with the agreement of Bellanti. Bellanti testified that the decision was a consensus of himself, the HR director, and the security manager.

### Inadmissible Affidavits

Plaintiffs Stokes and Gilberg have provided affidavits concerning information they heard from AWG employees following Plaintiffs' termination. Plaintiff Gilberg's affidavit indicates that Al Holzer, a 61-year-old warehouse manager for AWG, told Plaintiff Gilberg that another AWG supervisor named Eric Hill made certain statements to Holzer. Plaintiff Stokes's affidavit indicates that Darrell Plemmons, a 56-year-old warehouse manager for AWG, told Plaintiff Stokes that Eric Hill made certain statements to Plemmons. Both affidavits indicate that the statements in question

were that AWG was looking to fill supervisor positions with younger people and that neither Holzer nor Plemmons would be promoted for that reason.

The Court cannot consider this information. In making summary judgment rulings, the Court may only consider admissible evidence. This is an obvious example of hearsay evidence and there is no clear exception that applies. Although Eric Hill's statements to Holzer and Plemmons could be considered the statements of AWG, this does not cure the defect in that both Holzer and Plemmons[13] relayed the information to Plaintiffs Gilberg and Stokes.

## DISCUSSION

Plaintiff Leonard alleges age discrimination and gender discrimination under the Missouri Human Rights Act (MHRA). Plaintiff Gilberg alleges age discrimination under the MHRA. Plaintiff Stokes alleges age and disability discrimination and retaliation under the MRHA. All three Plaintiffs originally brought ERISA claims, but those claims have been dismissed. Plaintiff Stokes also brought claims under the Americans with Disabilities Act, but has also dismissed those claims.

### I. Retroactivity

The Missouri General Assembly passed legislation in 2017 concerning the standard to be used in assessing claims of discrimination under the MHRA. These claims accrued well before that change. Therefore, the first determination the Court must make is whether the Missouri General Assembly's amendments are retroactive.

---

[13] Unlike Eric Hill, Holzer and Plemmons cannot be said to have been speaking to Gilberg or Stokes in their capacity as supervisors for AWG, and their statements do not appear to be attributable to AWG for the purpose of a hearsay exemption. As such, while an exemption may apply to the statements Eric Hill made to Holzer and Plemmons, no such exemption seems applicable to the statements Holzer and Plemmons made to Gilberg and Stokes.

Effective August 28, 2017, changes were made to the MHRA concerning the standard to be used in assessing claims of discrimination under the MHRA. Previously, the MHRA used a "contributing to" standard. That is, an employer violated the MHRA if, in taking an adverse employment action, the employee's protected status contributed in any way to the employer's decision to take the adverse action. *See Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 819-20 (Mo. 2007) (en banc); *Wierman v. Casey's General Stores*, 638 F.3d 984, 1002 (8th Cir. 2011).

After the statutory change, the MHRA uses a "motivating factor" standard. This standard appears to be analogous to the standard used by federal courts under Title VII. The federal standard follows the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* standard requires that the adverse employment action be "motivated by" the employee's protected status. *See Cox v. Kansas City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 115 (Mo. 2015) (en banc) (comparing Missouri's MHRA standard with the federal standard). The Missouri Supreme Court has stated that the previous MHRA offered greater protection to employees than the federal standard. *Id.* Furthermore, Missouri's courts rejected the burden-shifting analysis that is applied under *McDonnell Douglas*. *Templemire v. W&M Welding, Inc.*, 433 S.W.3d 371, 383 (Mo. 2014) (en banc). The question before the Court is which standard applies to these claims which arose and were filed prior to the change, but not resolved prior to the change.

Statutes, and amendments to statutes, are generally presumed to operate prospectively, not retroactively. *Jones by Williams v. Mo. Dept. of Soc. Servs.*, 966 S.W.2d 324, 329 (Mo. Ct. App. 1998). However, there are two exceptions to this rule: "(1) the legislature clearly expresses its intent that it be given retroactive application in the express language of the act or by necessary or

unavoidable implication; or (2) the statute is merely procedural or remedial, not substantive, in its operation." *Dalba v. YMCA of Greater St. Louis*, 69 S.W.3d 137, 140 (Mo. Ct. App. 2002). Defendants admit in their initial Suggestions in Support that the first exception does not apply, but argue that the second applies.

The Missouri Supreme Court has spoken on this matter. Not through an appellate decision, but through its adoption of new Missouri Approved Jury Instructions for civil cases. In May 2018, the Missouri Supreme Court adopted recommendations submitted to it regarding new civil jury instructions. Among those new instructions are two instructions concerning the MHRA and the applicable standard. One instruction, MAI 38.01(A), explicitly applies only to those cases that accrued prior to August 27, 2018. It continues to apply the contributing factor standard to MHRA cases. For those cases accruing after August 27, 2018, a separate jury instruction applies which utilizes the *McDonnell Douglas* framework. MAI 38.06. While this is not an appellate decision of the Missouri Supreme Court that provides clear legal reasoning analyzing the basis of the decision to not apply the MHRA retroactively, it is nonetheless an official pronouncement by the Missouri Supreme Court of the status of Missouri law. The Court concludes that this alone provides a reasonable basis to apply the contributing factor standard in this case. However, the Court also believes the changes were substantive in nature and that the statutory change should only be applied to cause of actions arising after its effective date. The amendments to the MHRA did not merely modify the procedure by which employees obtain relief, it changed the standard of what constitutes discrimination prohibited under the MHRA. Prior to the amendments, many acts constitute discrimination which do not constitute discrimination under the new standard. In other words, the change will have the effect of eliminating causes of action for discriminatory acts which were prohibited under prior Missouri law.

## II. Teresa Leonard's Claims

Plaintiff Leonard has alleged violation of the MHRA in the form of age and gender discrimination. The Court denies summary judgment on Plaintiff Leonard's age discrimination claim, but grants summary judgment on her gender discrimination claim.

For a plaintiff's claim of discrimination to survive summary judgment, there must be a genuine issue of material fact as to whether the plaintiff's status as a member of a protected class was a "contributing factor" in the employer's determination to take adverse action. *Daugherty*, 231 S.W.3d at 820 (Mo. 2007). "Employment discrimination cases, as this Court has noted, 'often depend on inferences rather than on direct evidence . . . because employers are shrewd enough not to leave a trail of direct evidence.' " *Cox*, 473 S.W.3d at 116 (quoting *Daugherty*, 231 S.W.3d at 818 n.4). On the issue of age discrimination, there is much that can be inferred from the circumstances of Plaintiff Leonard's termination and the following period.

Even keeping in mind the nature of the language and implied meaning behind the language of the "Public Service Announcement" email that is at the center of Plaintiff Leonard's claims, the totality of the circumstances would allow Plaintiff to make a submissible case for age discrimination. First, there is a reasonable example of disparate treatment regarding the email sent by Scott Kamysz. Kamysz gained unauthorized access to the email account of Darrell Plemmons and used that account to impersonate Plemmons and send a sexually provocative email to his own supervisor. Yet, not only did Kamysz's direct supervisor not report the incident to HR, Kamysz only received a warning letter in his employment file when HR eventually learned of what happened. Kamysz, who was 35, received significantly more lenient treatment than any of the Plaintiffs. The argument can be made that Kamysz's email did not rise to the level of what Plaintiff Leonard printed. But that is an issue for a jury to resolve.

Second, Plaintiff Leonard's salary could raise an inference that her seniority (and by extension, her age) contributed to the decision to not show any leniency regarding the email. Furthermore, Plaintiff Leonard has asserted that she believes she was passed over for two promotions, even though she was the best qualified person, in favor of younger women. While Plaintiff Leonard's reliance on her participation in the old pension plan alone may not hold a significant degree of weight on its own, the Court does not believe it can be ignored when placed alongside the other matters in the context of all the circumstances. Inconsistent testimony concerning who made the decision to terminate, as well as the nature and circumstances of the investigation into the misconduct itself, could be viewed with suspicion by a jury. Many of AWG's own employees testified in a manner that could be seen as inconsistent concerning how the investigation was performed and how various email accounts were selected for examination. Putting everything together and considering all the circumstances, a genuine issue of material facts exists as to whether Plaintiff Leonard's age contributed to AWG's decision to terminate her employment. It is a decision appropriate for a jury.

Plaintiff's gender discrimination complaint does not have the same evidence supporting the inference of discrimination. Notably, Plaintiff Leonard has claimed to have been passed over for promotions in favor of younger *women*, a fact that can support her age discrimination claim but that does not lend support to her gender discrimination claim. The only evidence that Plaintiff Leonard points to appears to relate to the actions or words of Defendant Todd Cooper. Defendant Cooper played no role in Plaintiff Leonard's termination based on the record available to the Court. Although AWG's employees all told slightly different stories about the termination deliberation process, none implicated Todd Cooper as being part of that process, having a say in the outcome, or contributing to the information used in that process. The question is whether Plaintiff Leonard's

gender contributed to her termination, and there is no evidence that it did. Additionally, there is no evidence that Plaintiff Leonard ever reported Defendant Cooper for his comments or behavior, such that AWG could have taken her reporting of Defendant Cooper into consideration. Therefore, the Court grants summary judgment to Defendants on Plaintiff's claim for gender discrimination under the MHRA.[14]

Although the Court denies summary judgment to Defendant AWG on Plaintiff Leonard's age discrimination claim, it grants summary judgment to Defendant Todd Cooper. To prove a claim of age discrimination against Todd Cooper, Plaintiff Leonard must show that Defendant Cooper took some adverse employment action against her, and Plaintiff Leonard's age was a contributing factor to that action. The only adverse action Plaintiff complains of is her termination. As stated above, there is no evidence in the record to give this Court any reason to believe that Defendant Cooper was involved or otherwise participated in the decision to fire Plaintiff Leonard. As such, Defendant Cooper did not perform the adverse employment action of which Plaintiff complains, and he cannot be held liable for that action. Therefore, the Court grants summary judgment to Defendant Cooper on Plaintiff Leonard's age discrimination claim.

### III. David Gilberg's Claim

Plaintiff Gilberg has also brought an age discrimination claim premised on the MHRA. The Court denies summary judgment on this claim for substantially the same reasons as those stated regarding Plaintiff Leonard. Plaintiff Gilberg's salary, pension participation, and the investigation are all factors to be considered. The Court notes that Plaintiff Gilberg's termination

---

[14] Although Plaintiff Leonard's Complaint raises matters such as a hostile work environment as a basis for a gender discrimination claim, the facts alleged on summary judgment fall far short of what is necessary for such a claim to survive summary judgment. Little attention has been paid to these claims in Plaintiff Leonard's summary judgment response.

was, according to AWG, the result of Plaintiff Gilberg having received and sent an inappropriate email four years prior to the date of his termination. There is no evidence put forward that Plaintiff Gilberg was terminated for other conduct that occurred later.[15] This time lapse raises additional and very real questions as to whether AWG was simply looking for a reason to fire Plaintiff Gilberg. The example of the Kamysz email stands out prominently, as Kamysz essentially hacked another employee's email and impersonated that employee in sending a sexually provocative email. Yet, Kamysz only received a warning letter. A jury could very reasonably ask why Plaintiff Gilberg did not receive similar treatment, considering his conduct took place four years prior to his termination.

### IV. Douglas Stokes's Claims

Plaintiff Stokes brought claims for age discrimination, disability discrimination, and retaliation. The Court denies summary judgment as to the age discrimination claim for similar reasons as those stated regarding Plaintiffs Leonard and Gilberg. There was, again, a significant period of time between Plaintiff Stokes sending or receiving some of the emails involved in this dispute and the discovery of those emails. As with Plaintiff Gilberg, this raises questions as to why Plaintiff Stokes was fired without an opportunity to remediate his conduct. While some other emails were more recent and closer-in-time to the termination of his employment, and certainly it can be understood why AWG would have concerns with Plaintiff Stokes's emails to Ms. Cooper

---

[15] The Court notes that two of the emails received by Douglas Stokes were sent by David Gilberg. However, AWG seems to have taken the position that Gilberg would not be punished for those emails because they were not found in his own email account. To be certain, AWG has not presented evidence that those emails did, in fact, play a role in the determination to fire Plaintiff Gilberg.

and Ms. Gibson,[16] this merely raises more fact questions. It does not prevent Plaintiff Stokes from pursing his claims at trial.

With regard to Plaintiff Stokes's claim for disability discrimination, the Court denies summary judgment. The standard for disability discrimination under the MHRA is fundamentally the same, with the addition that Plaintiff Stokes must either be disabled or be regarded as disabled by AWG. *Hervey v. Mo. Dept. of Corrections*, 379 S.W.3d 156, 160 (Mo. 2012) (en banc); *Daugherty*, 231 S.W.3d at 821. In order to show that an employer regarded an employee as disabled, the employee must show the employer either "(1) wrongly believed that [the employee] had an impairment that substantially limited one or more major life activities or (2) wrongly believed that an actual, non-limiting impairment substantially limited one or more major life activities." *Daughtery*, 231 S.W.3d at 821. There is some evidence that would support Plaintiff Stokes's contention that he was at least regarded as being disabled by AWG.

It remains an open question as to whether those persons who made the decision to fire Plaintiff Stokes had any knowledge of Plaintiff Stokes's prior medical history or the attempts made to accommodate him in light of that medical history. There is no evidence put forward that they did not know, but neither is there evidence put forward that they did know.

Plaintiff Stokes suffered from two fainting events years prior to being fired and, while there is no evidence his doctors imposed restrictions on his work, he was given various accommodations at work to assist him. For example, his supervisors told him he could rest and put his feet up as needed or even lie on a cot if he felt it was necessary. Additionally, AWG provided Plaintiff Stokes with help in completing his tasks in the latter period of his employment, but those employees who

---

[16] The record does not include any indication that Ms. Cooper or Ms. Gibson filed complaints regarding the emails or for that matter found them in any way offensive.

provided assistance still had their own tasks that needed completing. Given the concerns that give rise to Plaintiff Stokes's age discrimination claim, it is not far-fetched to think a reasonable jury could conclude that AWG took this information into account when making its decision to fire Plaintiff Stokes. As such, the Court denies summary judgment on Plaintiff Stokes's disability discrimination claim.

As to Plaintiff Stokes's retaliation claim,[17] the Court grants summary judgment. AWG argued that it was entitled to summary judgment on this claim and Plaintiff Stokes offered no response. Therefore, the Court considered the claim abandoned and grants summary judgment.

## CONCLUSION

The Court **DENIES** summary judgment as to Count I of Plaintiff Leonard's complaint for age discrimination under the MHRA with regard to Defendant Associated Wholesale Grocers, Inc.

The Court **GRANTS** summary judgment as to Count I of Plaintiff Leonard's complaint for age discrimination under the MHRA with regard to Defendant Todd Cooper.

The Court **GRANTS** summary judgment as to Count III of Plaintiff Leonard's complaint for gender discrimination under the MHRA with regard to Defendants Associated Wholesale Grocers, Inc., and Todd Cooper.

The Court **DENIES** summary judgment as to Count I of Plaintiff Gilberg's complaint for age discrimination under the MHRA.

The Court **DENIES** summary judgment as to Counts I and II of Plaintiff Stokes's amended complaint for age discrimination and disability discrimination under the MHRA.

---

[17] This claim also alleged that AWG failed to accommodate Plaintiff Stokes's disability.

The Court **GRANTS** summary judgment as to Count III of Plaintiff Stokes's amended complaint for retaliation and failure to accommodate under the MHRA.

Therefore, the Court hereby **GRANTS-IN-PART and DENIES-IN-PART** Defendants' Motion for Summary Judgment (Doc. 143).

**IT IS SO ORDERED:**

Date: July 27, 2018

_____*/s/ Douglas Harpool*_____
**DOUGLAS HARPOOL**
**UNITED STATES DISTRICT JUDGE**
